**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TAMMY K. SHARP, )<br>)<br>    Plaintiff, )<br>)<br>        v. )<br>)<br>JO ANNE B. BARNHART, )<br>Commissioner of Social Security, )<br>)<br>    Defendant. ) | Civil Action No. 05-250 Erie |

**MEMORANDUM OPINION**

McLAUGHLIN, J.

Plaintiff, Tammy K. Sharp, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq,* and § 1381 *et seq.* Sharp filed applications for DIB and SSI on December 10, 2002 and December 12, 2002 respectively, alleging disability since July 12, 2002 due to headaches, a stroke and bad knees (Administrative Record, hereinafter "AR", 79-81, 92, 741-749). Her applications were denied, and she requested a hearing before an administrative law judge ("ALJ") (AR 59-62, 65, 750). Following a hearing held October 9, 2003, the ALJ found that Sharp was not entitled to a period of disability or disability insurance, and was not eligible for SSI benefits (AR 17-25). Sharp's request for review by the Appeals Council was denied (AR 7-9), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons that follow, we will deny Plaintiff's motion and grant Defendant's motion.

**I. BACKGROUND**

Sharp was born on April 4, 1965, and was thirty-nine years old at the time of the ALJ's decision (AR 17, 79). She has a high school education with no subsequent education or training (AR 98). She has past relevant work experience as a housekeeper, packer, check processor, gas

station attendant, cashier and deli worker (AR 17).

On July 12, 2002, Sharp underwent knee surgery for a right medial meniscus tear performed by William D. Fritz, M.D. (AR 430, 536).

On July 16, 2002, Sharp was seen by Teresa Bisnett, M.D. for evaluation of hypersomnia and possible sleep disordered breathing (AR 351-353). Sharp reported a history of chronic headaches with some improvement due to new medication (AR 351). She also reported, *inter alia*, a history of depression, strokes and knee surgery (AR 351). On physical examination, Dr. Bisnett noted that Sharp was in no acute distress, with a normal mood and affect, her vital signs were regular, and her weight was recorded as 271 pounds (AR 352). She exhibited mild right-sided weakness on motor strength testing, and her gait was somewhat slow due to her recent knee surgery (AR 352). Dr. Bisnett opined that the underlying etiology of her fragmented sleep and insomnia could be due to upper airways resistance syndrome, but considered that her significant caffeine and tobacco use could be contributing to her problems (AR 352). Dr. Bisnett recommended she discontinue her use of caffeine and quit smoking (AR 352).

Sharp returned to Dr. Fritz on July 24, 2002 for follow up of her knee surgery (AR 536). She exhibited a limp and small effusion, but Dr. Fritz expected it to resolve in two weeks (AR 536). Sharp complained of pain in her left knee, and she had discomfort on range of motion testing (AR 536).

On July 31, 2002, Sharp was seen by David Andres, D.O, her primary physician (AR 473). Dr. Andres reported that Sharp was doing better, and that her headaches had decreased (AR 473). She complained of depression secondary to her husband's multiple medical problems (AR 473). Dr. Andres prescribed hydrocortisone therapy for her headaches, and Paxil for her depression (AR 473).

On August 15, 2002, Sharp complained of burning, tingling pain between her fourth and fifth toes on the lower right extremity with a corresponding rash (AR 472). She was seen by Julia Bordell, PAC, who diagnosed her with probable herpes zoster, and prescribed Valtrex (AR 472). She returned for follow-up on August 21, 2002, and was prescribed Neurontin and Keflex (AR 471). She was to remain off work for approximately ten days, until August 28, 2002 (AR 457, 471, 492).

Sharp was evaluated by Michael K. Matthews, Jr., M.D., a neurologist, for her headache complaints on August 27, 2002 (AR 354-363). She reported that despite temporary improvement of her migraine symptoms, her symptoms had returned and she suffered from migraines once or twice per week, and suffered from constant pressure-like headaches (AR 354). Cranial nerve examination was normal, and motor examination revealed right side grip, biceps and triceps were 4/5, and quadriceps were 5/5 bilaterally (AR 355). Vibratory sensation was bilaterally symmetric distally in the upper and lower extremities, while pinprick sensitivity was greater on the left than on the right, mid-arm and ankle (AR 355). Dr. Matthews noted that a prior visual evoked response test was negative, a transesophageal echocardiogram showed a very small patent foramen ovale with minimal right to left shunt after valsalva, and a hypercoagulable evaluation was negative (AR 355).

Dr. Matthews assessed Sharp with an abnormal MRI scan, with the abnormalities less prominent compared to the prior scan, and considered the following differential diagnoses: migraine syndrome, demyelinating disease and stroke (AR 355). Since there were inconsistencies in her examination, he found it "impossible" to make a diagnosis (AR 355). He further assessed her with a questionably abnormal MRA, chronic daily headache, possible parasomnia, depression, and impaired vision, with the possibility of pseudotumor cerebri (AR 356). Dr. Matthews recommended a repeat MRI and MRA in one year, and continued use of Topomax to help prevent her migraines (AR 356). He opined that there was "no clear reason that she should not work" (AR 357).

When seen by Dr. Fritz on August 29, 2002, he reported that Sharp's right knee was doing well (AR 536). Her left knee continued to cause her pain, but she had a full range of motion (AR 536, 708). She was scheduled for left knee surgery in September 2002 (AR 536).

Sharp returned to Dr. Andres' office on September 4, 2002 for follow-up of her herpes zoster (AR 469). She reported feeling better and that her pain was controlled (AR 469). She claimed however, that she was unable to return to work because the pain was intensified by wearing shoes (AR 469). Dr. Andres opined that Sharp was unable to return to work until September 30, 2002 due to persistent shingles (AR 496).

On September 13, 2002, Sharp underwent surgery for a left medial meniscus tear (AR

3

427).  She was treated for a fractured right foot on September 18, 2002 (AR 426).  When seen by Dr. Fritz on September 30, 2002, he observed that her left knee was "doing fine", and she exhibited a full range of motion with no redness or swelling (AR 534).  Her right foot however, was quite uncomfortable, and some swelling was noted (AR 534).

On October 14, 2002, Dr. Fritz reported that Sharp had a full range of motion of the left knee with no complaints of pain (AR 532).  He also noted that x-rays of her right foot showed that her fracture was healing well (AR 532).

When seen by Dr. Andres on October 23, 2002, he reported that Sharp was "doing pretty well overall" although she had some dizziness (AR 464).  Her headaches were doing "ok," and she reported she was under a lot of stress at home (AR 464).  A neurological examination was normal other than her tremors (AR 464).  Dr. Andres increased her Paxil dosage and added Antivert to her medication regime (AR 464).

On November 11, 2002, Sharp complained that her knee ached at night and kept her awake (AR 532).  Dr. Fritz reported that she had a good range of motion, but there was some discomfort (AR 532).  He recommended physical therapy and injection therapy (AR 532).

Sharp presented to the emergency room on November 12, 2002 and complained of a left-sided headache and dizziness, claiming that when she stood to walk she fell backwards (AR 402).  A CT scan of her head revealed mild atrophy focal in the left parietal lobe at the vertex, but no acute abnormality was seen (AR 407).

On November 14, 2002, Sharp returned to Dr. Andres' office for follow-up from her emergency room visit (AR 463).  She relayed the symptoms which necessitated the emergency room visit, namely, that she had difficulty walking, twitching in her left upper and lower extremities, difficulty speaking, and left sided temporal pain (AR 463).  Her husband reported that she seemed somewhat confused and held on to the wall for balance (AR 463).  On physical examination, Ms. Bordell found she was alert and oriented and in no acute distress, exhibited clear speech and was neurologically intact (AR 463).  She was assessed with left sided weakness and tremor, and visual disturbance (AR 463).  Ms. Bordell recommended evaluation by Dr. Virgile, a repeat MRI/MRA of the brain, and EEG, and a work up for hypercoagular state (AR 463).  Sharp was started on Plavix (AR 463).

Sharp was evaluated by Roger Virgile, M.D., an ophthalmologist, on November 15, 2002 (AR 364-365). Her chief complaint was possible seizure with left side weakness, and she relayed a history of three types of headaches (AR 364). Following visual testing, Dr. Virgile formed an impression of ptosis, hypersensitive retinopthy and headaches, possibly migraines (AR 364). He reported his findings as headaches with neurological symptoms, migrainous in nature with worrisome visual findings (AR 365). He recommended visual field testing and optic nerve follow up (AR 365).

Sharp underwent a brain MRI/MRA on November 18, 2002 (AR 366). Richard Kocan, M.D., noted there was a new development of a moderately large area of T2 lengthening change in the superior left cerebellar hemisphere, and increased changes in the white matter of the sub-cortical left parietal lobe (AR 366). Dr. Kocan interpreted this as consistent with an acute infarct of the left cerebellar hemisphere, likely involving the cerebellar artery (AR 366). He recommended she undergo evaluation for possible vasculitis of the central nervous system (AR 366). An EEG conducted on November 19, 2002 was reported as normal (AR 395).

Sharp presented to the emergency room on November 20, 2002 and complained of pain in the left side of her head and neck (AR 385). A physical examination was normal, and she was discharged in stable condition (AR 388).

Sharp underwent a cerebral angiogram on November 21, 2002 which revealed a 4mm left cavernous carotid aneurysm (AR 505-506). An MRI of her brain showed a moderate sized left cerebellar lesion consistent with the appearance of an acute infarct (AR 507). Small lesions in the deep white matter tracks of both cerebral hemispheres were also noted, but particularly in the left parietal lobe which were likely chronic (AR 507-508).

On November 21, 2002, Sharp was evaluated by Tudor Jovin, M.D., for suspected intracerebral hemorrhage, felt to be due to vasculitis (AR 509-512). Sharp related a history of chronic daily headaches for the past three years occasionally associated with nausea, but no vomiting or photophobia (AR 509). Dr. Jovin reviewed Sharp's diagnostic studies and performed a physical examination (AR 509-512). A neurological exam, cranial nerve exam, motor exam and strength testing were all reported as normal (AR 511). Dr. Jovin attributed her stroke to a hypercoagulable state, possibly caused by smoking and contraceptives, rather than

vasculitis (AR 511). He indicated another potential cause for her stroke may represent a patent foramen ovale (AR 511). Dr. Jovin recommended lower extremity Dopplers to rule out DVT and a cardiology referral for consideration for closure of the patent foramen ovale (AR 511-512). Sharp was strongly advised to quit smoking, and her contraceptive use had already been discontinued (AR 512). A venous evaluation revealed no evidence of DVT in the lower extremities (AR 502-503).

Sharp returned to Dr. Andres' office on November 25, 2002 for follow-up regarding her angiogram (AR 461). Ms. Bordell noted that Sharp was diagnosed with a Cerebellar CVA, which Ms. Bordell indicated explained the ataxia and double vision (AR 461). She was assessed with CVA, chronic prednisone use, and patent formen ovale (AR 461). Fosamax was added to her medication regime (AR 461).

When seen by Dr. Fritz on November 26, 2002, he reported that she had good range of motion of the knee with no swelling or effusion (AR 528). She reported her recent mild stroke, but claimed she had no residual weakness (AR 528). Dr. Fritz administered an injection for her knee (AR 528). By December 2002, Sharp stated she was doing well and continued to exhibit a good range of motion (AR 528). She further reported that she had only minimal discomfort, had less discomfort weight bearing and on stairs, was walking more, and had increased her activity (AR 526, 528).

On December 12, 2002, Sharp returned to the emergency room complaining of a severe left-sided headache, shakiness, and sweatiness (AR 370). A CT scan of her head showed mild lateral ventricular dilatation and areas of low density were seen in the subcortical regions in the posterior parietal lobe on the left, but no acute abnormality was noted (AR 379). No neurological deficit was found, and Sharp was discharged home in stable condition (AR 373, 379).

Sharp returned to Dr. Andres on December 16, 2002, who noted she was "not doing well" (AR 459). Dr. Andres reported that she was having sweats and tremors from the increased dosage of Prednisone, but had no new complaints (AR 459). He decided to keep her off work until July 2003, wean her from the Prednisone, and restart Neurontin (AR 459).

When seen by Dr. Fritz on December 17, 2002, physical examination of Sharp's left knee

revealed a full range of motion with no swelling or effusion (AR 704). Dr. Fritz reported that she experienced good relief with the Supartz injections (AR 704).

On December 18, 2002, Sharp was evaluated by Howard Cohen, M.D., for consideration of patent foramen closure (AR 499-501). On February 21, 2003, Dr. Cohen performed successful surgery to close Sharp's patent foramen ovale (AR 636-642). When seen by Dr. Cohen for follow-up on March 4, 2003, he reported that she was "doing very well" and that the results of her surgery were "gratifying" (AR 628-630).

Sharp was seen by Dr. Andres on January 20, 2003 and denied any major symptoms except recurrent shingles, and her physical examination was otherwise normal (AR 702). She reported that Dr. Ham told her she may have a tumor on her pituitary gland since her Prolactin level was elevated (AR 702). An MRI of her brain with enhanced attention to the pituitary gland conducted on January 24, 2003 revealed a normal appearing pituitary gland with no new changes seen (AR 678). Sharp complained of lower extremity swelling when seen by Ms. Bordell on January 28, 2003 (AR 701). She reported that her headaches were controlled and that she had no dizziness or shortness of breath (AR 701). On physical examination, Sharp walked slowly but did not require an assistive device, and there was some swelling noted in her lower extremities (AR 701). She was to check her weight daily and avoid salt and salt products (AR 701). On January 31, 2003, Sharp felt better and her shingles had improved (AR 700). By February 20, 2003, her swelling had completely resolved (AR 699).

On March 7, 2003, Sharp sought emergency room treatment for a sprained right ankle (AR 612). X-rays showed no fracture or dislocation (AR 618). Sharp reported her sprained ankle to Dr. Fritz on March 10, 2003 (AR 526). Dr. Fritz noted she had mild tenderness with range of motion and mild swelling (AR 526). He recommended she wear an air splint as needed (AR 526). Sharp continued to complain of ankle pain on March 25, 2003 (AR 524). Dr. Fritz observed that she walked with an antalgic gait and had mild swelling, but x-rays showed no fracture or dislocation (AR 524). He recommended continued use of the air splint, rest, elevation and the use of an ACE wrap (AR 524).

Sharp underwent a physical disability evaluation conducted by Vajayaprabha

Ramanujam, M.D. on March 12, 2003 (AR 514-521).[1] Dr. Ramanujam noted in his review of systems that Sharp had numbness in her face, periodic migraines, left mouth droop, and occasional swelling of her knees, hands and feet (AR 514). He diagnosed stable hypertension, history of frequent migraines, depression, anxiety, and chronic pain (AR 515). Dr. Ramanujam completed a Medical Source Statement of Sharp's ability to perform work-related activities based upon his physical examination (AR 516-518). He opined that she was able to frequently lift and carry twenty pounds, stand and walk for one to two hours, sit for six hours, was limited in her push/pull abilities in her upper and lower extremities, could perform occasional postural activities, and had no environmental limitations (AR 516, 518).

Sharp returned to Dr. Andres' office on April 15, 2003 complaining of pain in her hands, knees, feet, back and muscles (AR 697). She claimed her headaches had worsened and her medications did not help the pain (AR 697). She was assessed with myalgias, headaches, degenerative joint disease of the knees and right hip pain (AR 697). Ms. Bordell scheduled an x-ray of her right hip and an appointment with a pain specialist (AR 697).

On April, 22, 2003, V. Rama Kumar, M.D., a state agency reviewing physician, reviewed the medical evidence of record and opined that Sharp could occasionally lift and carry up to twenty pounds; frequently lift and carry up to ten pounds; could stand or walk for at least two hours in an 8-hour workday; sit for about six hours in an 8-hour workday; had unlimited push/pull ability; and could occasionally climb, balance, stoop, kneel, crouch and crawl (AR 603-604).

On April 24, 2003, Roger Glover, Ph.D., a state agency reviewing psychologist, reviewed the evidence of record and concluded that Sharp's anxiety related disorder was not a severe impairment (AR 590-601).

On April 28, 2003, Sharp complained of swelling and redness on her left lower extremity and a red streak moving up her right leg (AR 694). Ms. Bordell diagnosed her with cellulitis with lymphangitis, and prescribed medication (AR 694). When seen for follow-up the next day, the redness had decreased and there was no increased swelling, but she had increased discomfort in her right lower extremity (AR 693). On physical examination, Sharp had trace pitting edema

---

[1] Pages one and three of the evaluation are missing from the record.

bilaterally, but her swelling, erythema and warmth had gone down dramatically and there were no visible red streaks (AR 693). Ms. Bordell prescribed medication and recommended elevation and application of ice to her leg (AR 693).

Sharp returned to Dr. Cohen on June 6, 2003 for follow-up (AR 625). Dr. Cohen reported she had no "neurological symptoms whatsoever" and "remain[ed] fully active" (AR 625). Her physical examination was normal, and Dr. Cohen reported that she was doing well from a symptomatic point of view (AR 625).

In June 2003, Sharp was dehydrated and taken off all medications due to pregnancy (AR 676). On June 24, 2003, she complained of anxiety and migraine headaches, and asked to restart her medications (AR 676). Dr. Eric Fackler, M.D., noted that Sharp's depression and anxiety disorder were well controlled with Paxil (AR 679).

Finally, Sharp was interviewed at the Venango County Mental Health/Mental Retardation Administration on September 8, 2003 (AR 736-739). She reported difficulty coping, and a past medical history of a stroke and heart repair (AR 736). She claimed to suffer from constant pain, had fibromyalgia, sleep difficulties and constant headaches (AR 736-737). Sharp informed the interviewer that she was frightened by her pregnancy since she had been advised against pregnancy (AR 736). She took care of her three nephews due to her sister's death from a house fire for which she blamed herself (AR 736). Sharp reported difficulties with her husband (AR 736).

Psychologically, Sharp indicated she was always anxious to the point of having constant panic attacks, she had situational anxiety connected with her pregnancy and problems with her husband, and was unable to concentrate (AR 737). She claimed she was depressed, sad, anxious and had mood swings (AR 737). The interviewer observed that Sharp had good insight into her problems, but seemed to be repressing her feelings (AR 737). Outpatient therapy, a medication check, and a psychiatric evaluation were recommended (AR 738).

Sharp and Karen Krull, a vocational expert, testified at the hearing held by the ALJ on October 9, 2003 (AR 26-56). Sharp testified that she took a leave of absence in July 2002 due to knee surgery (AR 34). Prior to her leave of absence, she required time off work due to left knee surgery and constant headaches (AR 35). Sharp claimed that she suffered from severe headaches

two to four times per week with associated dizziness and nausea, which lasted all day (AR 36-37). Medication did not alleviate her headaches, and she was unable to function when suffering from one (AR 37).

Sharp further testified that she suffered from swelling in her ankles, feet, knees and hands (AR 38). She claimed that she was consistently reprimanded by her supervisors for missing work due to her numerous health problems (AR 40-41). Since suffering from her stroke, she was afraid to go places and was afraid of people (AR 43-44). She experienced a tremor in her right hand, numbness in both hands, and weakness in her left hand (AR 45). She was unable to pick things up without dropping them (AR 45). Sharp indicated that at times she had trouble dressing herself, was unable to run the sweeper, and had no social or recreational life (AR 46-48).

The ALJ asked the vocational expert to assume an individual with Sharp's vocational background, who was capable of performing sedentary work (AR 52). The expert testified that such an individual could perform Sharp's past work as a check processor (AR 52). The expert further testified that such an individual could perform sedentary work as a cashier, receptionist, and information clerk (AR 53). Finally, the expert testified that all of the identified jobs would be eliminated if Sharp's claimed limitations were accepted as fully credible (AR 53-54).

Following the hearing, the ALJ issued a written decision which found that Sharp was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 17-25). Her request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 7-9). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

### III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Sharp met the disability insured status requirements of the Act (AR 24). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117.

The ALJ determined that Sharp's stroke residuals, sequelae of knee and ankle injuries as well as heart surgery, and migraine headaches were severe impairments, but determined at step

three that she did not meet a listing (AR 24).[2] The ALJ found that she retained the ability to lift ten pounds frequently and twenty pounds occasionally, could stand/walk two hours in an eight hour workday, could sit for six hours in an eight hour workday, and therefore, was capable of performing a full range of sedentary work (AR 25). He determined that she was able to perform the requirements of her past relevant work as a check processor, as well as the sedentary jobs cited by the vocational expert at the administrative hearing (AR 25). The ALJ additionally determined that Sharp's allegations regarding her limitations were not totally credible (AR 24). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Sharp first contends that the ALJ erred in failing to consider her obesity pursuant to Social Security Ruling ("*SSR*") 02-01p.[3] We find this contention without merit in light of the Third Circuit's recent decision in *Rutherford v. Barnhart*, 399 F.3d 546 (3rd Cir. 2005). In *Rutherford,* the court addressed the issue of whether an ALJ's failure to mention a claimant's obesity warranted a remand, stating:

> An ALJ is required to consider impairments a claimant says he has, or about which the ALJ receives evidence. Although [the claimant] did not specifically claim obesity as an impairment (either in his disability application or at his hearing), the references to his weight in his medical records were likely sufficient to alert the ALJ to the impairment. Despite this, any remand for explicit consideration of [the claimant's] obesity would not affect the outcome of this case. Notably, [the claimant] does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk. Additionally, the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of [the claimant's] obesity. Thus, although the ALJ did not explicitly consider [the claimant's] obesity, it was factored indirectly into the ALJ's decision as part of the doctor's opinions.

*Rutherford,* 399 F.3d at 552-53 (*quoting Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

---

[2] The ALJ further determined that her depressive disorder with anxiety features was a "non-severe" impairment (AR 24).

[3] The Social Security Administration issued *SSR* 02-01p to provide guidance on how to evaluate obesity-related disability claims. *See SSR* 02-01p, 2000 WL 628049.

Like the situation presented in *Rutherford,* we find that a remand for explicit consideration of Sharp's obesity would not affect the outcome of this case.  Here, Sharp did not allege obesity as a disability in either her application or at the hearing.  *See Woods v. Barnhart*, 2005 WL 1923554 at *1 (E.D.Pa. 2005) (remand not necessary since claimant never raised obesity as an impairment or limitation before the ALJ, and did not specify or discuss how her obesity further impaired her ability to work either in her application, during her consultative examination or at the hearing).  Moreover, nothing in the medical records suggest that Sharp's alleged obesity was a factor in her medical conditions or her functional level.  *See Balanian v. Barnhart,* 2005 WL 2886215 at *3 (E.D.Pa. 2005) (court declined to remand since claimant did not testify that her weight was a problem and her doctors' evaluations did not provide that her weight contributed to her ailments); *Woods*, 2005 WL 1923554 at *1 n.2 (finding it noteworthy that no physicians' reports or notations included in the record mention or discuss how the claimant's obesity further contributed to her limitations or impaired her ability to work).  Finally, the ALJ adopted the assessments Dr. Ramanujam, who examined Sharp, and Dr. Kumar, the state agency reviewing physician, who were aware of her obesity but did not mention or find that her obesity contributed to any impairment.  *Rutherford*, 399 F.3d at 553 (because doctors were aware of claimant's obesity, ALJ's adoption of their conclusions constituted satisfactory if indirect consideration of that condition); *Woods*, 2005 WL 1923554 at *1 (ALJ's adoption of physician's conclusions who was aware of claimant's obesity constituted satisfactory consideration of the impairment).  Accordingly, the ALJ's failure to explicitly address Sharp's obesity does not warrant remand.

Sharp next challenges the ALJ's evaluation of the medical evidence, arguing that he failed in his duty to consider all the relevant evidence, namely, the treatment notes of Drs. Fee, Cohen and Andres.  With respect to Dr. Fee's treatment notes, the administrative record reveals that Dr. Fee treated Sharp from December 8, 1998 to January 7, 2002 (AR 245-296).  Sharp has alleged a disability onset date of July 12, 2002, and the ALJ rendered his decision on July 22,

2004 (AR 25, 79-81).  Since these records fall outside the relevant period of alleged disability, we find no error in the ALJ's failure to discuss them and, consequently, no basis for remand.

We further reject Sharp's contention that the ALJ failed to address Drs. Cohen and Andres' treatment notes since a review of his discussion demonstrates otherwise.  As an initial matter, we note that the ALJ represented in his opinion that he considered all the evidence of record, including the documentary evidence and related testimony (AR 17, 21).  Here, the ALJ cited Dr. Cohen's records in Exhibit 19F, noting that she was referred for patent foramen ovale closure, and he specifically found that her "heart surgery" was a severe impairment (AR 19, 24).  Although the ALJ did not refer to specific exhibit numbers, he observed that most of Sharp's medical complaints had been resolved through surgery (AR 22).  Notably, this finding is supported by the record.  When seen by Dr. Cohen for follow up after her surgery, he reported that Sharp was "doing well" and the results of her surgery were "gratifying" (AR 628-630).  Four months post surgery, Sharp's physical examination was completely normal, she had no neurological symptoms whatsoever, and Dr. Cohen reported she was doing well from a symptomatic point of view and "remain[ed] fully active" (AR 625).

The ALJ also considered Dr. Andres' treatment notes in his evaluation of the medical evidence.  The ALJ cited to Exhibits 18F, 19F, and 21F, as well as the findings contained therein (AR 19-20).  For example, the ALJ discussed the results of Sharp's angiogram which revealed that she had suffered a cerebellar CVA, and that she was scheduled for a work-up by a cardiologist for evaluation of her patent foramen ovale (AR 19).  He further noted that in December 2002 she suffered tremors due to Prednisone treatment (AR 19).  The ALJ discussed the fact that she was seen through 2003 for lower extremity swelling, which diminished as her strength increased in her upper and lower extremities as a result of physical therapy (AR 20).  The ALJ observed that in January 2003 Sharp was no longer complaining of headaches and her strength was improved, and that she was treated for cellulitis of the right lower extremity and lymphangitis in April 2003 (AR 20).  While the ALJ did not specifically mention Dr. Andres by

14

name, it is clear he was discussing his treatment notes. To the extent Sharp contends that the ALJ did not discuss all of Dr. Andres' treatment notes, consideration of all the evidence does not mean that the ALJ must explicitly refer to each and every finding contained in a report. *See Fargnoli v. Massanari*, 247 F.3d 34, 42 (3rd Cir. 2001) (ALJ not required to discuss every treatment note); *Hur v. Barnhart*, 94 Fed. Appx. 130, 133 (3rd Cir. 2004) (no requirement that ALJ discuss every "tidbit" of evidence included in the record). We therefore find no merit to Sharp's argument.

In a related argument, Sharp asserts that the ALJ never addressed Dr. Andres' opinions which precluded all work activity from August 2002 through at least July 2003, which opinions should have been entitled to controlling weight. It is well settled in this Circuit that the opinion of a treating physician is entitled to great weight and can only be rejected on the basis of contrary medical evidence. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988). An ALJ must articulate in writing his or her reasons for rejecting such evidence. *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981). The ALJ however, is not required to specifically reject every notation in the medical record that is potentially favorable to the claimant. *Cotter* requires that the ALJ indicate that he/she considered all the evidence, and provide some explanation as to why he/she rejected probative evidence that would have suggested a contrary disposition; the ALJ "is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482. We do not view Dr. Andres' opinions however, as contrary to the ALJ's conclusions. Dr. Andres' first opinion indicated that Sharp was unable to work from August 15, 2002 through September 30, 2002 due to "persistent shingles" (AR 457, 471, 492, 496). When seen by Dr. Andres on December 16, 2002, he decided to preclude work until July 2003 (AR 459).

We first observe that Dr. Andres' opinions are not entitled to controlling weight since they are on an issue reserved to the Commissioner. *See Knepp v. Apfel*, 204 F.3d 78, 85 (3rd Cir. 2000) ("The ultimate decision concerning the disability of a claimant is reserved for the

15

Commissioner."). Moreover, Dr. Andres did not provide any narrative explanation or specific findings to support his assessment. A relevant factor in determining whether a treating physician's opinion is entitled to controlling weight is the degree to which his opinion is supported by an accompanying explanation. *See* 20 C.F.R. § 404.1527(d)(3). A review of Dr. Andres' treatment notes on the day he rendered his opinion that Sharp was precluded from work until July 2003, reflect that her physical examination was normal, and other than increased sweating and tremors due to an increased dosage of Prednisone, she otherwise felt well for the most part (AR 459). One month later, she denied any major symptoms except recurrent shingles, and her physical examination was otherwise normal (AR 702).

Dr. Andres' opinion was also at odds with the consultative examiner's findings and the state agency reviewing physician's findings. Dr. Ramanujam, the consulting examiner, opined in March 2003 that Sharp was able to frequently lift and carry twenty pounds, stand and walk for one to two hours, sit for six hours, was limited in her push/pull abilities in her upper and lower extremities, could perform occasional postural activities, and had no environmental limitations (AR 516, 518). In April 2003, Dr. Kumar, the state agency reviewing physician, found that Sharp could occasionally lift and carry up to twenty pounds, frequently lift and carry up to ten pounds, could stand or walk for at least two hours in an 8-hour workday, sit for about six hours in an 8-hour workday, had unlimited push/pull ability, and could occasionally climb, balance, stoop, kneel, crouch and crawl (AR 603-604).

Finally, and most notably, neither of Dr. Andres' opinions established that Sharp had any impairment that would preclude all work activity for at least twelve months as required by the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); (d)(2)(A); 1382c(a)(3)(A), (B). Although the ALJ did not explicitly discuss Dr. Andres' opinions that Sharp was precluded from work for a limited period of time, we find no error since the evidence carefully considered by the ALJ supports the conclusion that she was not disabled. *See Mays v. Barnhart*, 227 F. Supp. 2d 443, 449-50 (E.D.Pa. 2002), *aff'd,* 78 Fed. Appx. 808 (3rd Cir. 2003) (finding no reversible error in ALJ's

failure to discuss report since remainder of the evidence discussed by the ALJ supported the conclusion that claimant did not have a severe mental impairment).

Sharp next challenges the ALJ's residual functional capacity assessment ("RFC"). "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). In making this determination, the ALJ must consider all evidence before him. *Burnett*, 220 F.3d at 121.

Here, the ALJ found that Sharp was capable of performing a full range of sedentary work, in that she retained the ability to lift ten pounds frequently and twenty pounds occasionally, could stand/walk two hours in an eight hour workday, and sit for six hours in an eight hour workday (AR 22). The ALJ further found that his RFC determination was consistent with the opinion of the state agency medical consultant and the consultative examiner (AR 22). Sharp argues that Dr. Ramanujam's assessment (the consulting examiner), precluded her from maintaining a forty hour work week, and the ALJ erred in relying on Dr. Kumar's opinion (the state agency reviewing physician) in fashioning her RFC.

As previously indicated, Dr. Ramanujam, the consulting examiner, concluded that Sharp was able to frequently lift and carry twenty pounds, stand and walk for one to two hours, sit for six hours, was limited in her push/pull abilities in her upper and lower extremities, could perform occasional postural activities, and had no environmental limitations (AR 516, 518). Dr. Kumar, the state agency reviewing physician, found that Sharp could occasionally lift and carry up to twenty pounds, frequently lift and carry up to ten pounds, could stand or walk for at least two hours in an 8-hour workday, sit for about six hours in an 8-hour workday, had unlimited push/pull ability, and could occasionally climb, balance, stoop, kneel, crouch and crawl (AR 603-604). Sharp suggests that since Dr. Ramanujam found that she could stand and walk for "one to

two hours" as opposed to "at least two hours" as found by Dr. Kumar, she is precluded from working. Sharp's argument overlooks the fact that the capacity for standing and walking, as defined on the form, is cumulative in an eight hour day (AR 516). Moreover, we agree with the Commissioner that if Dr. Ramanujam meant to opine that Sharp could not walk for up to two hours, he would have checked the box which specified that she could only stand/walk for "one hour or less" (AR 516). Thus both opinions are consistent with a finding that Sharp could engage in sedentary work.

Sharp also argues that the ALJ failed to examine the medical evidence subsequent to Dr. Kumar's April 2003 assessment. Taking Sharp's objection at face value, it is not clear how this point demonstrates any basis for a finding of reversible error on the part of the ALJ since it is factually incorrect. The ALJ's decision reflects that he considered and discussed Sharp's treatment through 2003 for lower extremity swelling, and her treatment for cellulitis of the right lower extremity and lymphangitis in April 2003 (AR 20). In addition, he discussed her September 2003 psychological interview with the Venango County Mental Health/Mental Retardation Administration.

Finally, Sharp contends that the ALJ failed to analyze the functional limitations imposed by her headaches. It is undisputed that Sharp suffered from headaches, and the ALJ found that the medical evidence demonstrated they were a severe impairment (AR 24). However, disability is determined not by the mere presence of impairments, but rather by the functional restrictions placed on an individual by those impairments. *See Jones v. Sullivan,* 954 F.2d 125, 129 (3rd Cir. 1991). Here, although the record documents a history of headaches, not one physician imposed any functional restrictions as a result of her headaches. Moreover, Dr. Matthews, who evaluated Sharp's headaches, stated that there was "no clear reason that she should not work" (AR 357). Finally, Sharp herself reported in January 2004 that her headaches were controlled (AR 701). Although she complained of headaches in June 2003, such complaints were due to the fact that she had discontinued her medication due to her pregnancy (AR 676). We therefore find no error

in this regard.

## IV. Conclusion

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMMY K. SHARP, )<br>)<br>Plaintiff, )<br>)<br>v. ) | Civil Action No. 05-250 Erie |
| )<br>JO ANNE B. BARNHART, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | |

## **ORDER**

AND NOW, this 17th day of March, 2006, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 11] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 15] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, Tammy K. Sharp. The clerk is directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.